**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ASSOCIATION OF WASHINGTON
BUSINESS, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

        *Defendants.*

No. 23-cv-3605 (DLF)

---

## MEMORANDUM OPINION

In 2022, the Environmental Protection Agency promulgated a rule imposing federal water-quality standards on the State of Washington.  A cohort of Washington business associations sued to challenge the Agency's action under the Administrative Procedure Act and the Clean Water Act.  After the plaintiffs filed suit, the Agency moved to transfer this case to the U.S. District Court for the Western District of Washington.  In addition, the State of Washington and a handful of federally recognized tribes moved to intervene as defendants.  For the reasons that follow, the Court will deny the Agency's motion to transfer and grant the various motions to intervene.

## I.    BACKGROUND

### A.    Factual Background

The Clean Water Act "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)).  To further this "program of cooperative federalism," *New*

*York v. United States*, 505 U.S. 144, 167 (1992) (cleaned up), the Act requires states "from time to time []but at least once each three year period" to develop "applicable water quality standards," including "criteria" designed to protect designated "uses" for a state's water, 33 U.S.C. § 1313(c)(1)–(c)(2).  The Environmental Protection Agency publishes "criteria for water quality accurately reflecting the latest scientific knowledge" to aid states in developing these standards.  *Id.* § 1314(a)(1).  Among such criteria are so-called "human health criteria," governing the levels of "chemicals or conditions in a water body that are not expected to cause adverse effects to human health."  Compl. ¶ 30, Dkt. 1; *see* 40 C.F.R. § 131.11(a)(1).

After a state has revised or adopted a new water-quality standard, the standard "shall be made available to the Administrator" of the Environmental Protection Agency for approval.  33 U.S.C. § 1313(c)(1).  If the Administrator "determines" that a state's water-quality standard "meets the requirements of" the Act, the state's "standard shall thereafter be the water quality standard for the applicable waters of that State."  *See id.* § 1313(c)(3).  If the Administrator "determines" that a state's water-quality standard "is not consistent with the applicable requirements of" the Act, however, the Administrator shall "notify the State and specify the changes to meet such requirements."  *Id.*  If the state does not adopt those changes within an allotted period of time, "the Administrator shall promulgate such [water-quality] standard[s]" for the state, imposing a federal standard.  *Id.*

Relevant here are the State of Washington's water-quality standards for polychlorinated biphenyls ("PCBs"), which are "a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms."  *Learn About Polychlorinated Biphenyls*, Env't Prot. Agency, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls. [https://perma.cc/6ER4-4JHP].

Although Congress outlawed PCBs, they "may still be present in products and materials . . . that were produced before the 1979 PCB ban."  Compl. ¶ 35.

In 2016, Washington proposed approximately 188 new human-health criteria.  *See id.* ¶ 49.  The Agency then approved 45 of Washington's proposed criteria but disapproved 143; one of the criteria the Agency rejected was Washington's PCB criteria, arguing that it was "insufficiently protective."  *Id.* ¶ 50; *see* Revision of Certain Federal Water Quality Criteria Applicable to Washington, 81 Fed. Reg. 85417, 85419 (Nov. 28, 2016).  In relevant part, the Agency reasoned that "more highly exposed subgroups," such as "subsistence fishers," required more thorough protection from PCBs.  Compl. ¶ 51 (cleaned up).  The Agency was particularly concerned with "cover[ed] areas where tribes have treaty-reserved rights to practice subsistence fishing."  81 Fed. Reg. at 85424–25.  The Agency in turn promulgated federal human health criteria to supplant Washington's disapproved criteria.  *See* 81 Fed. Reg. at 85419.

But in 2019, the Agency reversed course, "determining that its partial disapproval had improperly infringed on Washington's authority under the [Clean Water Act] to make its own risk-management decisions based in sound science."  Compl. ¶ 56.  More specifically, the Agency determined that Washington's proposed PCB standard was "based on sound science" and "protective of Washington's designated uses."  Withdrawal of Certain Federal Water Quality Criteria Applicable to Washington, 85 Fed. Reg. 28494, 28496 (May 13, 2020).  The Agency also reasoned that it was "improper and unnecessary" to "harmonize" tribal-treaty rights with the Clean Water Act.  *See* Letter from Chris Hladick, Reg'l Adm'r, United States Env't Prot. Agency Region 10 to Maia Bellon, Dir., Wash. Dep't of Ecology at 22–24 (May 10, 2019), https://www.epa.gov/sites/default/files/2019-05/documents/wawqsletter_td_dated_may_2019 .pdf [https://perma.cc/HBL4-65BM].  On May 13, 2020, the Agency promulgated a final rule

approving Washington's proposed human-health criteria and withdrawing the corresponding 2016 federal standard.  *See* 85 Fed. Reg. at 28494.

In 2022, however, the Agency doubled back and proposed the reimposition of federal water-quality standards "for Washington waters" resembling those in the 2016 rule.  *See* Restoring Protective Human Health Criteria in Washington, 87 Fed. Reg. 19046, 19051 (Nov. 18, 2022).  The Agency reasoned that Washington's human-health criteria had to consider "tribal members exercising their legal right to harvest and consume fish and shellfish at subsistence levels" as a "target general population" and reiterated the "same rationale" as in 2016.  *Id.* at 19054–55.

### B.     Procedural Background

A group of business associations—the Association of Washington Business, Northwest Pulp & Paper Association, American Forest & Paper Association, Greater Spokane, Inc., Food Northwest—brought this action against the Environmental Protection Agency and Administrator Michael Regan (together, the "Agency") to challenge the 2022 rule under the Administrative Procedure Act and Clean Water Act.  *See* Compl. ¶¶ 17–21, 66–135.  The plaintiffs argue, among other things, that the Agency reversed policy without justification and erroneously relied on tribal treaty rights.  *See, e.g.*, *id.* ¶¶ 76–91.  As relief, they seek vacatur of the 2022 rule.  *See id.* at 39.

The Agency moved to transfer under 28 U.S.C. § 1404(a) to the U.S. District Court for the Western District of Washington.  *See* Mot. to Transfer at 1, Dkt. 19.  After the Agency filed its motion, the State of Washington, Quinault Indian Nation, Puyallup Tribe of Indians, Lower Elwha Klallam Tribe, Makah Indian Tribe, and Port Gamble S'Klallam Tribe all moved to

intervene as defendants.  *See* State of Wash.'s Mot. to Intervene, Dkt. 20; Quinault Indian Nation

Mot. to Intervene, Dkt. 30; Tribes' Mot. to Intervene, Dkt. 31.

## II.    LEGAL STANDARDS

If a case is brought in a proper venue, a party may nevertheless move to transfer to

another district under 28 U.S.C. § 1404(a).  This statute provides that "[f]or the convenience of

parties and witnesses, in the interest of justice, a district court may transfer any civil action to

any other district or division where it might have been brought or to any district or division to

which all parties have consented."  28 U.S.C. § 1404(a).  From this, two requirements emerge.

The Court must first ask whether the case "might have been brought" in the transferee court—a

question turning on the general venue statute, 28 U.S.C. § 1391.  *Van Dusen v. Barrack*, 376

U.S. 612, 623 (1964).  If that requirement is met, the Court then has "discretion . . . to adjudicate

motions for transfer according to an 'individualized, case-by-case consideration of convenience

and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*,

376 U.S. at 622).

As part of this discretionary second step, judges in this district consider "a number of

private- and public-interest factors."  *Stewart v. Azar*, 308 F. Supp. 3d 239, 245 (D.D.C. 2018).

The private interest factors include (1) "the plaintiff's preferred forum," (2) "the defendant's

preferred forum," (3) "where the claims arose," and (4) "the convenience to the parties,

witnesses, and to the evidence."  *McAfee, LLC v. U.S. Citizenship & Immigr. Servs.*, No. 19-cv-

2981, 2019 WL 6051559, at *1 (D.D.C. Nov. 15, 2019) (quoting *Gyau v. Sessions*, No. 18-cv-

0407, 2018 WL 4964502, at *1 (D.D.C. Oct. 15, 2018)).  And the public interest factors are (1)

"the transferee court's familiarity with the governing laws," (2) "each court's relative

congestion," and (3) "the local interest in resolving the controversy."  *Id.* (quoting *Gyau*, 2018

WL 4964502, at *1).  In adjudicating a transfer motion, the Court must protect against "the danger that a plaintiff might manufacture venue in the District of Columbia . . . [b]y naming high government officials as defendants."  *Cameron v. Thronburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993).  But the party seeking transfer carries the burden to show that transfer is both proper and in the private and public interest.  *See Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 65 (D.D.C. 2003).

Further, Rule 24 of the Federal Rules of Civil Procedure "outlines two different avenues by which a court can allow an outsider to intervene—intervention of right, and permissive intervention."  *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1044 (D.C. Cir. 1998).  Rule 24(a) provides for intervention of right when a third party either "is given an unconditional right to intervene by a federal statute" or "claims an interest . . . that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a); *see Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003) (describing the four-factor test to be applied).

Rule 24(b) also provides for permissive intervention by a third party who either "is given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law."  Fed. R. Civ. P. 24(b).  The D.C. Circuit has "eschewed strict readings of the phrase 'claim or defense,' allowing intervention even in situations where the existence of any nominate claim or defense is difficult to find."  *Nat'l Children's Ctr., Inc.*, 146 F.3d at 1046 (cleaned up).  The Court must also "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  The Court retains "considerable latitude to grant or deny intervention based

on the particular circumstances of the case" under Rule 24(b).  *Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 313 (D.D.C. 2011) (cleaned up).  Independently, it is also "circuit law that intervenors must demonstrate Article III standing," whether the intervenor is a would-be plaintiff or defendant.[1]  *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013); *see also id.* at 195 (Silberman, *J.*, concurring) ("[D]istrict courts have discretion to grant permissive intervention under Rule 24(b), which requires only that a party have a claim or defense that shares with the main action a common question of law or fact.  Opening participation to parties without standing would be quite troublesome." (cleaned up)).

## III.    ANALYSIS

### A.    Motion to Transfer

The Court turns first to the Agency's motion to transfer this action to the United States District Court for the Western District of Washington.

#### 1.    *Appropriateness of New Venue*

As a threshold matter, the Court concludes that this action "might have been brought" in the U.S. District Court for the Western District of Washington.  28 U.S.C. § 1404(a).  Per 28 U.S.C. § 1391(e)(1)(C), a civil action against "an officer or employee of the United States or any agency thereof acting in his official capacity" may "be brought in any judicial district in which"

---

[1] The Tribes argue that D.C. Circuit precedent requiring standing for intervenors is "plainly inconsistent with[] the Supreme Court's recent opinions."  *See* Tribes' Mot. to Intervene at 4–5 (quoting *Env't Integrity Project v. Wheeler*, No. 20-cv-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) (Jackson, *J.*)); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (holding that an appellate court "erred by inquiring into [an intervenor's] independent Article III standing" when the intervenor sought the same relief as the defendant-appellant).  But given that the intervenor-defendants all have Article III standing, the Court does not need to decide here whether the Supreme Court's decisions clearly "eviscerate[d] the circuit precedent[] such that the two decisions are incompatible with each other."  *McCarthy v. Pelosi*, 480 F. Supp. 3d 28, 35 (D.D.C. 2020) (cleaned up).

"the plaintiff resides if no real property is involved in the action." It is uncontested that at least two of the plaintiffs reside within the Western District of Washington. *See* Compl. ¶¶ 17, 18; Reply in Supp. of Mot. to Transfer at 2, Dkt. 25. As such, this case could have been brought in the Western District of Washington, so § 1404(a)'s threshold requirement is satisfied.

With this threshold cleared, the Court turns its attention to whether the "particular circumstances" of this case "render [this] forum inappropriate." *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974).

### 2.   *Private Interest Factors*

The Court is concerned with three categories of private-interest factors: (i) the parties' choice of forum, (ii) the claims' connection to the forum, and (iii) convenience to the parties and witnesses and the accessibility of the evidence. On balance, these factors counsel against transfer.

### i.   Parties' Choice of Forum

The Court first considers how much deference to afford each side's forum preference. Starting with the plaintiffs, "[a] plaintiff's choice of forum is generally afforded substantial deference, but that deference is not unyielding." *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 311 (D.D.C. 2015) (cleaned up). *But see Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) ("[T]his deference is mitigated if the plaintiffs' choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." (cleaned up)). "When a plaintiff brings suit in its forum of residence, it is entitled to a strong presumption in favor of the chosen forum." *Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 5 (D.D.C. 2013). This presumption applies here because one of the five plaintiffs (American Forest & Paper Association) has its headquarters in Washington, D.C. *See* Compl. ¶ 19; *see also*

*Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 11 (D.D.C. 2007) (applying this presumption when a plaintiff "has its headquarters in the District of Columbia[] and is thus clearly a resident of this District"). The mere fact that other plaintiffs are not from the District of Columbia does not, standing alone, vitiate the presumption. *See, e.g.*, *Greater Yellowstone Coal.*, 180 F. Supp. 2d at 129 (denying transfer when "two of the five plaintiffs" were located in the District of Columbia).

The Agency contends that the Court should afford no such deference to the plaintiffs' choice of forum. In their view, the fact that American Forest & Paper Association's headquarters is in the District of Columbia is "tenuous" and "outweighed" by the location of other plaintiffs in the Pacific Northwest and their "alleged harm stemming from . . . Washington members that are subject to . . . permitting requirements." Mot. to Transfer at 14. The Agency directs the Court to *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, in which an agency challenge was transferred out of the District of Columbia "despite one plaintiff being based out of Washington D.C." Mot. to Transfer at 14 (citing *Citizen Advocs. for Responsible Expansion, Inc. v. Dole*, 561 F. Supp. 1238, 1239–40 (D.D.C. 1983)); *see also* Reply in Supp. of Mot. to Transfer at 9–10 (arguing that "one plaintiff's residency in the District of Columbia would not be afforded deference where '*as a whole*, plaintiffs had strong ties to the transferee forum and little connection to the District of Columbia'" (quoting *Van Antwerp*, 523 F. Supp. 2d at 12 n.4)).

Though these arguments carry some heft, they ultimately fail to persuade. To start, the Agency provides no evidence casting doubt on American Forest & Paper Association's allegation that it resides in Washington, D.C. And, in any event, as the Agency notes, deference to a party's forum choice "require[s] an individualized case-by-case analysis," not a per se rule

eviscerating deference if only one of several plaintiffs resides in the District of Columbia. *Van Antwerp*, 523 F. Supp. 2d at 12 n.4.

"[I]n consideration of all relevant factors," the Court concludes that deference is warranted here. *Id.* This is not a case like *Citizen Advocates for Responsible Expansion, Inc.* in which one of four plaintiffs was located in the District of Columbia but the remaining plaintiffs all had "strong ties to the Northern District of Texas" and "little connection" to the District of Columbia. 561 F. Supp. at 1239–40. Of the five plaintiffs here, only two reside in the Western District of Washington, and the remaining three reside in the Eastern District of Washington, Oregon, and Washington, D.C. *See* Compl. ¶¶ 17–21. A majority of the plaintiffs thus lack connection to the Agency's proposed transferee district.[2] And in further contrast to *Citizen Advocates for Responsible Expansion, Inc.*, for the reasons discussed at greater length in Section III.A.2.ii, *infra*, "[i]t is simply not true that this district has no meaningful connection to or interest in the controversy," *Oceana, Inc.*, 58 F. Supp. 3d at 5. Indeed, the Agency's leadership, which is headquartered in Washington, D.C., played an indispensable role in the promulgation, rescission, and ultimate reinstatement of the challenged rule. The Court will thus "give some weight to the plaintiffs' choice of forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013).

Furthermore, such deference "outweighs" the Agency's "request to send this case to a particular court" in the Western District of Washington. *Stewart*, 308 F. Supp. 3d at 246. Unlike a plaintiff's forum preference, a defendant "is not ordinarily entitled to deference . . . over [a] [p]laintiff's opposition" unless the defendant "establish[es] that the added convenience and

---

[2] The Agency also contends that the majority of the plaintiffs are "headquartered in the Pacific Northwest." Mot. to Transfer at 14. But 28 U.S.C. § 1404(a) speaks to a "district or division," not geographic regions like the Pacific Northwest comprising "district[s] or division[s]."

justice of litigating in their chosen forum overcomes the slight deference" afforded to the plaintiff. *Tower Lab'ys, Ltd. v. Lush Cosmetics Ltd.*, 285 F. Supp. 3d 321, 326 (D.D.C. 2018). As discussed in Section III.A.2.iii, the Agency has not shown that it would be more convenient to litigate this case in the Western District of Washington. As a general matter, in an APA case, "the convenience" of litigation is "not likely to be relevant." *Oceana*, *Inc.*, 58 F. Supp. 3d at 7 (cleaned up). In addition, only two of the five plaintiffs (and neither of the defendants) are from the Western District of Washington, so the Court is hard pressed to conclude that there is much, if any, "added convenience" to transfer.[3] *Tower Lab'ys, Ltd.*, 285 F. Supp. 3d at 326. Instead, the Court finds "the [Agency's] request unduly restrictive, given" the plaintiffs are "geographically dispersed" throughout the country and the alleged "situs of the case expands beyond" the Western District of Washington specifically. *Stewart*, 308 F. Supp. 3d at 246.

The parties' forum preferences thus weigh against transfer.

### ii.    Claims' Connection to the Forum

In challenges to agency action, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose." *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). "An administrative claim is said to arise in this district if it was drafted, signed, and published in this district, and if the controversy 'stems from the formulation of national policy on an issue of national significance.'" *Oceana, Inc.*, 58 F. Supp.

---

[3] After the defendants filed their motion to transfer, a handful of Native American tribes and the State of Washington moved to intervene as defendants. As discussed in Section III.B, *infra*, the Court will grant these motions to intervene. But it is not inclined to give the intervenor-defendants' transfer preferences any significant weight in the analysis. As a formal matter, the intervenors did not enter the picture until after the Agency filed its motion to transfer. The Court is also concerned, as a general matter, that deference to permissive intervenors' forum preferences would create a perverse incentive to intervene to tip a Court's transfer analysis. In addition, the parties here have sought to intervene independent of the Court's transfer analysis, implying their willingness to litigate this case outside their home jurisdictions.

3d at 6 (quoting *Greater Yellowstone Coal. v. Kempthorne*, No. 07-cv-2111, 2008 WL 1862298, at *5 (D.D.C. 2008)).  For administrative claims arising from "a cooperative program between federal and state governments," this factor weighs against transfer even if the action "had [its] genesis" in a particular state as long as there are "meaningful ties" to the District of Columbia. *Stewart*, 308 F. Supp. 3d at 247 (cleaned up).

Here, there is no question that the plaintiffs challenge a final rule "drafted, signed, and published" in the District of Columbia.  *Oceana, Inc.*, 58 F. Supp. 3d at 6.  Indeed, Administrator Michael S. Regan signed both the proposed and final water-quality standards, and the notice of the proposed rule directed all comments to the Agency's headquarters and Office of Water located in Washington, D.C.  *See* Restoring Protective Human Health Criteria in Washington, 87 Fed. Reg. 19046, 19046, 19061 (Apr. 1, 2022) (proposed rule); Restoring Protective Human Health Criteria in Washington, 87 Fed. Reg. 69183, 69183, 69198 (Nov. 18, 2022) (final rule).  Although Washington first proposed the water-quality standards, the plaintiffs challenge a final federal rule "promulgated pursuant to authority belonging only to the" Administrator, and the Administrator "ultimately signed them."  *Oceana, Inc.*, 58 F. Supp. 3d at 6; *see* 33 U.S.C. § 1313(c) (detailing how the Administrator reviews, revises, and publishes water-quality standards—as illustrated in this case).

What is more, the Agency submitted declarations confirming that Washington, D.C. officials were not mere "rubber-stamp[s]"; rather, they played an essential role in developing, revising, and finalizing the rule.  *Stewart*, 308 F. Supp. 3d at 247.  For example, Sara Hisel McCoy, an Office of Water official located in Washington, D.C., represents that her office oversees the "review and approval or disapproval of new or revised [water-quality standards] submitted to EPA by states and the promulgation of federal standards."  Decl. of Sara Hisel

McCoy ¶ 2, Dkt. 19-2.  This D.C.-based office "partner[ed]" with the Agency's Region 10 office in Seattle, Washington to promulgate the rule challenged in this action.  *Id.* ¶ 3.  Both offices formed a "workgroup . . . responsible for" promulgating the rule that included "senior leadership in both offices," and both offices "worked in partnership [at] each . . . step[] in developing drafts of the Proposed and Final Rules."  *Id.* ¶ 5.  The draft proposed rule was submitted "to the Office of Water" in Washington, D.C. "for review and input" before reaching the desk of Administrator Regan.  *Id.* ¶ 6.  During the comment period, headquarters and Region 10 staff cosponsored "public hearings" on the proposed rule.  *Id.* ¶ 7.  The working group then jointly collaborated to finalize the rule "and draft responses to comments" before Administrator Regan signed off in Washington, D.C. ¶ 8.  The McCoy declaration all but confirms that D.C.-based officials had "heavy" "personal involvement" in the rule's promulgation, providing a meaningful "link between this controversy and the District of Columbia" even though this case "will [primarily] have an impact on the residents" of Washington.  *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 13–14 (D.D.C. 2000).

The declaration of Hanh Shaw, a Region 10 branch manager, corroborates McCoy's representation that Region 10 and headquarters officials "worked in tandem . . . to promulgate the challenged final rule."  Decl. of Hanh Shaw ¶ 10, Dkt. 19-3.  Shaw represents that Region 10 staff "provided technical support" and "assisted" with the rule's drafting but does not, at any point, suggest Region 10 led the charge more than the headquarters team.  *Id.*  Shaw does note, however, that Region 10 led "EPA's public outreach efforts and facilitate[ed] engagement with federally-recognized tribes in Washington and affected tribes in neighboring states."  *Id.* ¶ 11.  Engagement with stakeholders outside the District of Columbia counts for something, but the Court is primarily concerned with where the "*decisionmaking process* occurred to determine

where the claims arose." *Stewart*, 308 F. Supp. 3d at 246 (emphasis added) (quoting *Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179).

At bottom, both McCoy and Shaw represent that at least half the decisionmaking—*i.e.*, discussions, promulgation, and revisions of the rule—occurred in Washington, D.C.  To boot, the final sign off occurred exclusively here.  Headquarters officials thus offered far more than "minor editorial comments" or "explanatory information"; rather, as the declarations confirm, D.C.-based officials performed "the key policy work that resulted in the challenged" rule.  Mem. Op. at 7–8, *Oak Ridge Env't Peace All. v. Perry*, No. 17-cv-1446 (D.D.C. Mar. 23, 2018).  The Court thus concludes that the plaintiffs' claims have "meaningful ties" to the District, counseling against transfer.  *Stewart*, 308 F. Supp. 3d at 247.

Given the foregoing analysis, the Court has no need to accept the plaintiffs' invitation to delve into the "as-yet-unfiled administrative record."  *See* Opp'n to Mot. to Transfer at 16, Dkt. 24.  That said, the Court's decision is informed by another factor clearly relevant to where the plaintiffs' claims arose: namely, the change in presidential administrations.  The Agency's reversals in 2020 and 2022 coincided with changes in leadership in Washington, D.C.  In contrast, the Agency has not provided evidence that the elections changed either regional agency personnel or circumstances on the ground in Washington state.  Circumstantially then, it would appear that the most significant developments related to this case occurred in the nation's capital.

The Agency's arguments to the contrary are unavailing.  It asserts that this factor weighs in favor of transfer because Region 10 provided "extensive input . . . at each step" and "led all outreach efforts."  Mot. to Transfer at 15.  But that is not sufficient.  The role played by non-D.C.-based officials in this case did not "overshadow[]" "any role played by officials in the District of Columbia."  *Pac. Mar. Ass'n v. NLRB*, 905 F. Supp. 2d 55, 61 (D.D.C. 2012) (cleaned

up).  Quite to the contrary, as the Agency admits, "the ultimate decision to promulgate the challenged rule was made by EPA headquarters" and the decisionmaking process was otherwise a "partnership" between headquarters and Region 10.  Mot. to Transfer at 15.  The plaintiffs also cast doubt on the Agency's assertion that Region 10 was the only entity spearheading outreach.  *See* Opp'n to Mot. to Transfer at 16–17.

Further, the Court will not endorse the Agency's effort to bootstrap its arguments about the "local nature" of this controversy—a separate public-interest factor discussed in Section III.A.3.iii, *infra*—to this private-interest factor.  Mot. to Transfer at 16.  It is well established "[i]n cases brought under the APA" that the forum-connection factor centers "on where the decisionmaking process occurred," not on where the agency's action has its most concentrated effect.  *Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179.

The Court thus concludes that this factor weighs against transfer.

iii.    Convenience Factors

The convenience factors—the convenience of the parties, the convenience of the witnesses, and ease of access to sources of proof—are neutral.  Although the parties agree that the convenience of the witnesses and the ease of access to proof are neutral, *see* Mot. to Transfer at 17; Opp'n to Mot. to Transfer at 18, they disagree about the convenience to the parties.  The Agency posits that this factor is neutral, Mot. to Transfer at 17, but the plaintiffs contend that Washington, D.C. is more convenient to the parties because "[a]ll attorneys of record reside in this District, and nothing about the case requires the physical presence of the non-resident Plaintiffs," Opp'n to Mot. to Transfer at 18 (cleaned up).

The Court is unpersuaded.  It agrees with the Agency that this "factor considers the convenience of the 'parties,' not the parties' counsel," Reply in Supp. of Mot. to Transfer at 13,

and generally the "location of counsel carries little, if any, weight" in a transfer analysis, *id.* (quoting *Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 324 (D.D.C. 1991)).  This is also not a case like *Oceana, Inc. v. Pritzker*, in which the plaintiff "has just one staff member in that district . . . and it would be forced to retain local attorneys or have its own lawyers admitted *pro hac vice* there."  58 F. Supp. 3d at 7.  Rather, two of the plaintiffs reside in the Western District of Washington.  In any event, in an APA case such as this, it is exceedingly "unlikely that the parties or the lawyers for either side will have to appear in court often" given the electronic format of the administrative record.  *Id.*; *see* Reply in Supp. of Mot. to Transfer at 12 ("As Plaintiffs acknowledge, this case will be resolved on the administrative record without witnesses and the convenience-of-witnesses and ease-of-access-to-proof factors are neutral.").

This factor is thus neutral.  And contrary to the plaintiffs' assertion, neutrality does not per se counsel against transfer.  Opp'n to Mot. to Transfer at 18.  A neutral factor neither weighs in favor of nor against transfer.  *See Ngonga v. Sessions*, 318 F. Supp. 3d 270, 276 (D.D.C. 2018).  The movant does, however, carry the ultimate burden to show all the factors tip in favor of transfer.  As such, if all the factors on the whole are neutral, the movant would have necessarily failed to carry its burden.  But that does not mean that each neutral factor itself counsels against transfer.

\*   \*   \*

On balance, the private-interest factors thus tip against transfer.

      3.    *Public Interest Factors*

The public-interest factors relevant to transfer are: (i) "the transferee's familiarity with the governing laws"; (ii) "the relative congestion of the calendars of the transferor and transferee

courts"; and (iii) "the local interest in having local controversies decided at home." *Stewart*, 308 F. Supp. 3d at 245. The Court will consider each in turn.

i.     Transferee Court's Familiarity

The respective districts' familiarity with the governing laws does not carry much weight either way because this case arises from a dispute of statutory interpretation. And the Court abides by "the principle that the transferee federal court is competent to decide federal issues correctly." *Oceana, Inc.*, 58 F. Supp. 3d at 7 (quoting *Flowers*, 276 F. Supp. 2d at 70 n.6). When "both courts are competent to interpret the federal statutes involved . . . there is no reason to transfer or not transfer based on this factor." *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006). If anything, this Court arguably "has more experience with APA cases," slightly weighing against transfer. *Stewart*, 308 F. Supp. 3d at 248.

The Agency's contrary arguments fail to persuade. It contends that "there has been prior litigation regarding the human health criteria applicable to Washington waters occurring in the Western District of Washington." Mot. to Transfer at 10–11. It details efforts (1) to compel the Agency to initiate rulemaking before the 2016 rule took effect and (2) to challenge the now-rescinded 2020 rule. *See* Mot. to Transfer at 11–12 (first citing *Puget Soundkeeper All. v. EPA*, No. 13-cv-1839, 2014 WL 4674393 (W.D. Wash. Sept. 18, 2014) (action to compel rulemaking on water-quality standards); then citing *Puget Soundkeeper All. v. EPA*, No. 16-cv-293, 2016 WL 4127315 (W.D. Wash. Aug. 3, 2016) (same); then citing Compl., *Washington v. EPA*, No. 19-cv-884 (W.D. Wash. June 6, 2019), Dkt. 1 (challenging the EPA's 2020 rule rescinding its 2016 water-quality standard); and then citing Compl., *Puget Soundkeeper All. v. EPA*, No. 20-cv-907 (W.D. Wash. June 11, 2020), Dkt. 1 (same)). The "relevant inquiry," however, "is not whether a certain court is familiar with the factual and legal history of a case, but whether it is

more familiar with the governing laws." *Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 126 (D.D.C. 2018) (cleaned up).  Here, the "prior litigation" had nothing to do with the central legal issue here: namely, whether the Agency's rulemaking in *this* case comported with the Clean Water Act and the APA.  Instead, the suits to compel rulemaking reached only the issue whether the Agency's duty to promulgate a water-quality standard was triggered, *see Puget Soundkeeper All.*, 2014 WL 4674393, at *2–6, and whether the Agency's proposed timeline for rule promulgation was reasonable, *see Puget Soundkeeper All.*, 2016 WL 4127315, at *2–4.  And the challenges to the 2020 rule were dismissed without adjudication on the merits.  *See* Joint Stipulated Mot. to Dismiss, *Washington v. EPA*, No. 19-cv-884 (W.D. Wash. Jan. 30, 2023), Dkt. 88; Joint Stipulated Mot. to Dismiss, *Puget Soundkeeper All. v. EPA*, No. 20-cv-907 (W.D. Wash. Jan. 30, 2023), Dkt. 34.

As such, none of the earlier challenges in the Western District of Washington reached the heart of this dispute.  The Agency has provided no evidence that courts in the Western District of Washington have weighed in on the Agency's rulemaking here, and the plaintiffs suggest that no such cases exist.  *See* Opp'n to Mot. to Transfer at 20.  Although the Western District of Washington may be familiar with the "factual and legal history" of this case, *Ctr. for Biological Diversity*, 310 F. Supp. 3d at 126, it has no special competence with the issues of law presented.

Accordingly, this factor is neutral or slightly weighs against transfer.

          ii.    Court Congestion

Concerning "the relative congestion of the courts' calendars," *Oceana, Inc.*, 58 F. Supp. 3d at 7, the Court concurs with the parties that this factor is neutral.  *See* Mot. to Transfer at 12; Opp'n to Mot. to Transfer at 21.  Per the Administrative Office's statistics (as reported by the Agency), this District "takes about 4.7 months to resolve civil case as compared to 6.4 months in

the transferee district," and the average caseload here is 418 cases per judge compared to 426 cases per judge in the Western District of Washington.  Mot. to Transfer at 12.  This factor is thus neutral.

### iii.    Local Interest

The final factor the Court must consider is "the local interest in having local controversies decided at home."  *Stewart*, 308 F. Supp. 3d at 249.  Among the "public-interest factors," local interest is "arguably most important."  *Preservation Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 57 (D.D.C. 2012) (cleaned up).  The Agency argues that the local interest in this case "heavily" weighs in favor of transfer because the "Final Rule primarily affects those within the State of Washington."  Mot. to Transfer at 9.  It compares this case to *Alaska Wilderness League v. Jewell*, in which several environmental groups challenged a United States Fish and Wildlife Service regulation "allow[ing] certain oil and gas industry players to unintentionally 'take' . . . Pacific walruses in the Chukchi Sea off the coast of Alaska." 99 F. Supp. 3d 112, 113 (D.D.C. 2015).  In that case, Judge Bates transferred the matter to the District of Alaska because the regulation "most *directly* affect[ed] Alaskan lands, livelihoods, waters, and wildlife" and "concern[ed] *only* the incidental-take of Pacific walruses . . . more than a few steps removed from the national issue of how, where, or when America gets its oil and gas."  *Id.* at 117.  In addition, the Agency points to the "wide public interest" in human health criteria among Washington residents, the state government, and federally recognized tribes. Mot. to Transfer at 10–11.

The Agency's arguments carry some force, and the Court does not doubt that the citizens of Washington have an interest in this case's outcome.  That said, the Agency overplays the weight of the local-interest factor for several reasons.  First, the local nature of the controversy is

not as strong as that in *Alaska Wilderness League*.  In deciding to transfer the matter, Judge

Bates placed substantial weight on the fact that the challenged "incidental-take regulation

affect[ed] just one state: Alaska."  *Alaska Wilderness League*, 99 F. Supp. 3d at 118.  Indeed, he

contrasted the case from *Oceana, Inc.*, in which Judge Boasberg declined to transfer a case about

"government action . . . off the coast of three different states that directly affected the entire Gulf

Coast region."  *Id.*  This case is closer to *Oceana, Inc.* than *Alaska Wilderness League*.  By the

Agency's own admission, the challenged rule—though technically regulating Washington waters

alone—"potentially affects the neighboring States of Idaho and Oregon."  Mot. to Transfer at 9.

Region 10 also consulted "tribes in the Pacific Northwest," not exclusively in Washington state,

demonstrating the broader impact of the rule outside of state borders. Rule.  *Id.* at 15.

Second, as the plaintiffs suggest, the Agency's rule is a "question[] of national policy or

national significance."  *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 77

(D.D.C. 2013).  The record supports the plaintiffs' contention that the Agency intends to roll out

the treaty-rights interpretation on a nationwide basis.  *See* Opp'n to Mot. to Transfer at 22.  After

promulgating the final rule at issue here, the Agency proposed a different rule incorporating its

treaty-rights interpretation—*i.e.*, setting water-quality standards to protect tribal-reserved

rights—into "a nationally applicable regulatory framework."  *See* 87 Fed. Reg. 74361, 74366-67

(Dec. 5, 2022).  In its reasoning for this proposed rule, the Agency noted that it "previously

addressed tribal reserved rights in state-specific" approvals in Washington and Maine but now

seeks to nationalize these requirements.  *See id.* at 74365 & n.34.  Whether the Agency's tribal-

rights interpretation is consistent with the Clean Water Act in this case will thus bear on the

effort to adopt this interpretation nationwide.  To be sure, the Agency is generally correct that

this case "will be reviewed solely on its own record and not in relation to other EPA actions."

Reply in Supp. of Mot. to Transfer at 5.  But the Agency does not deny that the *effects* of the Court's decision will spill beyond Washington and reach the Agency's efforts to adopt its treaty-rights interpretation nationwide.

In *Stewart v. Azar*, the Court denied a motion to transfer on a similar basis.  There, Judge Boasberg declined to transfer a challenge to the Department of Health and Human Services's approval of Kentucky's effort to enact Medicaid work requirements.  *See* 308 F. Supp. 3d at 249–50.  Although the effects of the Department's approval would "be felt 'locally' in Kentucky," the effects were "spilling out past Kentucky."  *Id.* at 249.  For example, the Department "recently approved [another state's] work-eligibility Medicaid requirements," and it invited other states to adopt similar policies.  *Id.*  So too here: the Agency has expressed an intention to spread its treaty-rights interpretation to other regulated states.  The Agency contests the applicability of *Stewart* because the challenged rule "is expressly limited in application to" Washington's surface waters.  Reply in Supp. of Mot. to Transfer at 3.  But in *Stewart* the rule was also confined to a single state, and the Court nevertheless accounted for the broader context, including the Agency's efforts to replicate the rule in other states.  *See* 308 F. Supp. 3d at 249.

Third, as discussed in Section III.A.2.ii, *supra*, this case differs from those in which "a local federal-agency office made a decision involving local resources that are located entirely in a proposed transferee district."  *Stewart*, 308 F. Supp. 3d at 249.  Rather, a significant portion of the decisionmaking behind the challenged rule occurred in Washington, D.C., thus establishing at least a modicum of local interest in retaining the case in the District.

In sum, the local-interest factor is either neutral or slightly favors transfer.  Though this is the "most important" public-interest factor, *id.*, "no single factor is dispositive in a motion to transfer."  *Oceana, Inc.*, 58 F. Supp. 3d at 5.  The majority of factors are either neutral or counsel

against transfer.  Given the significant involvement of D.C.-based officials in promulgating the final rule at issue here and the potential national effects of the Court's decision, the Court will thus deny the Agency's motion to transfer to the Western District of Washington.

**B.    Motion to Intervene**

The Court turns next to the Tribes' and the State of Washington's motions to intervene. The Court will grant both motions.

1.    *Tribes*

The Quinault Indian Nation, Lower Elwha Klallam Tribe, Makah Indian Tribe, Port Gamble S'Klallam Tribe, and Puyallup Tribe of Indians (together, the "Tribes") move to intervene, *see* Dkts. 30, 31, without objection from either party, *see* Notice of Defs.' Position on Intervention at 1, Dkt. 42; Pls.' Resp. to Tribal Mots. to Intervene at 1, Dkt. 43.  Given neither party opposes permissive intervention under Rule 24(b), the Court "will decide intervention under that standard without engaging in Rule 24(a) intervention as a matter of right analysis." *Van Antwerp*, 523 F. Supp. 2d at 6 n.2.  For permissive intervention under Rule 24(b), the Tribes must show that they have (1) Article III standing[4] and (2) a "timely motion" based on "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1); *accord Nat'l Children's Ctr., Inc.*, 146 F.3d at 1046.  The Court concludes that this test is satisfied.

To start, the Tribes have demonstrated Article III standing.  To "establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury

---

[4] As discussed in note 1, *supra*, the Court assumes without deciding that standing is required for permissive intervention.

would likely be redressed by judicial relief." *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  The Tribes allege that the Agency's rule is "harmonized" with various treaty protections of tribal fishing rights.  Quinault Nation Mot. to Intervene at 9; *see* Tribes' Mot. to Intervene at 6–7.  These "treaty fishing rights" protect "healthy" fishing practices—"integral part[s] of [tribal] culture, spiritual practice, and way of life."  Tribes' Mot. to Intervene at 7.  As such, if the rule is deemed inconsistent with the Clean Water Act and enjoined, the Tribes' fishing rights and source of sustenance may be impaired by "higher levels of pollutants."  Quinault Mot. to Intervene at 9.  In short, the plaintiffs' desired relief would remove a benefit received by the Tribes under the challenged policy, satisfying all three components of Article III standing.  *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015).

Further, the Tribes have satisfied the requirements for permissive intervention. Permissive intervention requires a showing of (1) "an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Nat'l Children's Ctr.*, 146 F.3d at 1046.  *First*, "this is a federal-question case [under the Clean Water Act and Administrative Procedure Act,] and the Tribes do not seek to expand the scope of the Court's subject-matter jurisdiction," which would require an independent basis for jurisdiction.  Tribes' Mot. to Intervene at 18.  *Second*, their motion is timely because it was filed approximately two months after this suit was filed.  *See* Dkts. 30, 31. Also, as the existing parties concede, intervention would not be prejudicial nor cause undue delay.  *See Nat'l Children's Ctr., Inc.*, 146 F.3d at 1047.  *Third*, "the Tribes intend to oppose [p]laintiffs' claims and requests for relief, offer defensive arguments, and seek the same relief" as the Agency, Tribes' Mot. to Intervene at 19, easily satisfying the liberal "claim or defense" requirement, *see Ctr. for Biological Diversity*, 274 F.R.D. at 312–13.  *Finally*, the Court believes

that the Tribes' involvement would advance the "just and equitable adjudication" of this matter"—specifically, their perspective on the Agency's treaty-rights interpretation. *Id.* at 313 (cleaned up).

### 2. *State of Washington*

The State of Washington has also moved to intervene. The Agency does not oppose intervention, *see* Notice of Defs.' Position on Intervention at 1, Dkt. 26, and the plaintiffs "generally do not oppose the motion" either, Pls.' Resp. to the State of Wash.'s Mot. to Intervene at 1, Dkt. 27. The plaintiffs do, however, ask for "full[] consider[ation]" of whether Washington has established Article III standing. *Id.* In their view, Washington has not asserted a cognizable injury in fact because vacatur of the Agency's 2022 rule "would *restore* the very same state criteria that Washington itself adopted under the [Clean Water Act's] regulatory scheme." *Id.* at 2. Nor has Washington "claim[ed] that restoration of those standards would inflict additional costs or other cognizable harms not already imposed by the CWA itself or EPA's adoption of the 2022 rule." *Id.* at 4. An "abstract preference for retaining the federal 2022 rule" is insufficient for Article III, according to the plaintiffs. *Id.*

But the plaintiffs overcomplicate the matter. To comply with Article III, a party must allege that it "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 141 S. Ct. at 2203. A harm is "concrete" if it shares a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (cleaned up). "[C]ertain harms . . . such as . . . monetary harms" will "readily qualify" under this test. *Id.* And it is well established that the loss of a single dollar is a concrete harm for which a party may seek redress. *See Czyzewsi v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an injury." (cleaned

up)); *cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("Despite being small, nominal damages are certainly concrete."). Here, Washington alleges that vacatur of the Agency's 2022 rule would force it to "use the state regulatory process to readopt the [federal] protective criteria" as a matter of state law. State of Wash's Reply in Supp. of Mot. to Intervene at 3, Dkt. 28. It would need to "spend state resources to conduct rulemaking to restore the protective criteria [p]laintiffs seek to vacate." *Id.* In simpler terms, vacatur would cause Washington to initiate a costly rulemaking, which is a pocketbook injury. A decision to uphold the Agency's final rule, however, would obviate the need for any cost-inducing rulemaking. That suffices to show an injury in fact.

The plaintiffs direct the Court to *National Fair Housing Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018), but that case does not say otherwise. There, the Department of Housing and Urban Development decided to withdraw "an Assessment Tool" used by local governments and public-housing authorities to track their compliance with the "the duty to affirmatively further the purposes and policies of the Fair Housing Act." *Id.* at 22. Withdrawal of the Assessment Tool would in turn require local jurisdictions to track their own "progress in meeting" the Fair Housing Act's requirements. *Id.* at 22–23. As relevant here, the State of New York moved to intervene as a plaintiff to enjoin withdrawal of the Tool. *Id.* at 23. New York alleged that the Department's action injured its "proprietary interests" by making "it more difficult for . . . local jurisdictions to analyze barriers to fair housing choices or identify meaningful actions to address these barriers." *Id.* at 64. Judge Howell found this argument lacking. To start, New York was not itself "a local government entitled to use the . . . Tool," so its injury was "speculative"—*i.e.*, based on the assumption that local governments' reports to the state would be "less 'robust' or 'complete'" without the Tool. *Id.* at 64–65. In addition, New

York failed to establish standing on a *parens patriae* theory because it did not show that its interest in "eradicating discrimination in all its forms" was meaningfully undermined "without a published Assessment Tool" given the Fair Housing Act's substantive requirements continued to apply in full force. *Id.* at 65–66.

Here, Washington's alleged harms do not suffer from the same faults.  Unlike the challenged agency action in *National Fair Housing Alliance*, the challenged rule affects the entire state, not merely a subdivision thereof.  Moreover, if the Court vacates the Agency's rule, Washington will incur expenses to initiate a rulemaking to reinstate the federal rule's substantive requirements as a matter of state regulation.  Washington's commitment to the federal standard is in no sense abstract; rather, it has a track record of defending the Agency's heightened water-quality standards.  *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical."  (cleaned up)).  For example, during the notice-and-comment period for the 2020 rule, Washington objected to the Agency's proposed rescission of the 2016 rule, *see* 84 Fed. Reg. 38150, 38152 n.17 (Aug. 6, 2019), and it later sued to prevent the rescission from taking effect, *see* Compl., *Washington v. EPA*, No. 19-cv-884 (W.D. Wash, June 6, 2019), Dkt. 1.  That is all to say that unlike *National Fair Housing Alliance*, the state's alleged harm is rooted in a nonspeculative pocketbook injury that would arise if the Agency's final rule is set aside.

Contrary to the plaintiffs' assertion, Pls.' Resp. to State of Wash.'s Mot. to Intervene at 3, Dkt. 27, *Arizona v. EPA*, 77 F.4th 1126 (D.C. Cir. 2023), is also distinguishable.  There, the Environmental Protection Agency "extended the deadline for compliance with a revised national drinking water regulation, which in turn extended the deadline for states to enforce conforming

revisions to their own regulations." *Id.* at 1127.  Five states challenged the extension, claiming that "delayed enforcement of tougher regulations" would cause "residents to suffer health problems" and the states would in turn "lose money" on increased expenditures "on programs like Medicaid." *Id.* at 1129.  The D.C. Circuit rejected this theory of standing.  In its view, the states' alleged injuries were "self-inflicted" because nothing prevented them "from meeting their obligations ahead of the [extended] federal deadline." *Id.*  The states also failed to explain what, if any, additional "costs would flow" from earlier compliance with the original deadline.  *Id.* at 1130.  Here, in contrast, the Court's decision will directly bear on state coffers.  If the Court vacates the Agency's rule, Washington will need to spend money that it would not have otherwise spent on promulgating a more protective water-quality standard.  If the Court leaves the Agency's rule in place, Washington can continue complying with the federal water-quality standard without spending a dime.

Given Washington has established its Article III standing, the Court turns to the requirements for permissive intervention under Rule 24(b).  Here too, Washington passes the test. *First*, as discussed in Section III.B.1, *supra*, this is a federal-question case, and Washington is not seeking to expand the scope of the Court's subject-matter jurisdiction, *see* State of Wash.'s Mot. to Intervene at 12–13. *Second*, its motion is timely because it was filed approximately two months after the plaintiffs filed suit.  Also, the existing parties do not object to intervention, suggesting a lack of prejudice. *Third*, Washington has a "claim or defense" under Rule 24(b)'s liberal standard.  Fed. R. Civ. P. 24(b).  It seeks to intervene to "defend the human health criteria EPA restored" and that "Washington . . . consistently use[s]," and it will support the Agency's efforts to defend the final rule.  State of Wash.'s Mot. to Intervene at 12. *Finally*, Washington's involvement would advance the "just and equitable adjudication" of this matter because it can

weigh in on the local effects of the Agency's rule and any implementation issues.  *Ctr. for Biological Diversity*, 274 F.R.D. at 313.

To the extent Washington must comply with Rule 24(b)(2), it clears that hurdle too.  Rule 24(b)(2) provides that "[o]n timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on . . . a statute or executive order administered by the officer or agency."  Fed. R. Civ. P. 24(b)(2).  Assuming Washington state counts as a "state governmental . . . agency," it may intervene because the plaintiffs' challenge arises under the Clean Water Act, which is a "statute" Washington's Department of Ecology "administer[s]."  *Id.*; *cf. PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994) ("[T]he Clean Water Act establishes distinct roles for the Federal and state Governments.").

The Court will thus grant Washington's motion to intervene.

## CONCLUSION

For the foregoing reasons, the Court will deny the defendants' Motion to Transfer, Dkt. 19, and grant the State of Washington's, Quinault Indian Nation's, and the remaining Tribes' Motions to Intervene, Dkts. 20, 30, 31.  A separate order consistent with this decision and containing a schedule for further proceedings accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

June 28, 2024